May it please the Court, Robert Lundman representing the Federal Parties. Out of the appellant's 20 minutes, I plan on using 12 minutes. Mr. Richard Bress, also representing the intervenors, will use 8 minutes. I'd like to reserve 4 minutes for rebuttal. The four permits to grow stecklings at issue here are exactly the sort of interim and limited administrative action that the Supreme Court would explain in Monsanto v. Geertsen Seed Farms would be unlikely to result in an irreparable injury. There, following a vacatur of a deregulation determination for another genetically engineered crop, the Supreme Court explained that APHIS has the authority to allow limited planting while it completes an environmental impact statement. The Court reversed an injunction that had the effect of preventing APHIS from implementing any sort of partial regulatory action pending completion of the EIS. And in doing so, the Court noted that if the regulatory action was sufficiently limited, that in that situation, the risk of gene flow would be virtually nonexistent and there would be no irreparable injury or likely no irreparable injury on which to base an injunction. Here, APHIS, following the vacatur of the deregulation determination, followed exactly the path that the Supreme Court set forth in Monsanto. And it's approved four limited permits, and those are the permits at issue here. And the permits are limited in three ways, and those three limits establish that both plaintiffs lack standing, because they have not suffered any actual and imminent injury from the permits, and that they lack the injury sufficient for an injunction. And the three limits are, one, they're geographically limited. The permits approve only 526 acres of planting and 256 acres of which have actually been planted. Second, they're time limited. They're expiring very soon at the end of this month, February 28th. And third, the permits prohibit flowering. They ensure that the farmers who are growing these seed crops have to ensure that no flowering occurs. And that, coupled with sugar beet biology itself, ensures that between now and the end of February there will be no flowering. And flowering is important because only after these sugar beet plants flower will there be pollen released and then the possibility of gene flow. Without those steps, and the permits here are absolutely clear that those steps are not authorized, there's no risk of gene flow from these permits, and thus there's no irreparable harm to justify an injunction. There's no actual and imminent injury. Okay. At what point is there going to be irreparable harm, then? Well, we'd submit there likely won't be, but as we explain in our supplemental briefing. When is the appropriate place to measure? Filed on Friday. The appropriate place is now back in the district court in litigation that is going on right as we speak about APHIS's recent action announced on February 4th and 8th that would be issuing new permits and a partial deregulation determination that will, together, authorize the entire cycle of production. So it will authorize both seed crop growing and root crop production. And that agency action is what will trigger the debate about harms that plaintiffs are trying to insert into this case, whether allowing flowering and the risk of gene flow rises to the level of irreparable harm or not. Now, that's a debate that will happen in the district court in the first instance, but at least the agency action which will authorize that cycle will be – will have occurred. What we have here in this case, though, are just these four permits, which just authorize the threshold, time-limited, geographically-limited growth. And plaintiffs can't make any showing that these actions have created any risk of irreparable harm here because these actions do not run the risk of gene flow. And that's why APHIS was able to approve them over this limited time period. Sotomayor What are we going to know better in the pending action in the district court than could be measured here? Is it just that this has become extraneous? Or – In essence, I think it is going to become extraneous when these permits expire and the new permits supersede them. And it will become, I think, what you – Sotomayor Are you, in essence, arguing mootness? Well, we're saying it's going to be – it's not moot yet because there are no new permits and the new permits have not – the current permits – the current four permits haven't expired. But by February 28th, the current permits will expire and there likely will be new permits that authorize actions relating to these very step lengths. And that – those new authorizations, coupled with the environmental assessment – the new environmental assessment, which examines the whole – the whole entire cycle of production, that's when there will be a case in the district court first, and maybe someday here if there's an injunction either granted or denied, to assess whether that is – whether APHIS's action is proper or not, whether there's harm from those – from those later – that later authorization. But what we have here is limited. And those limits are incredibly important in that they cabin the risk and prevent injury that's necessary for standing and for an injunction. Now, plaintiffs cite to three different things in their briefs why they have injury here. The first is past harm, and it's primarily tied to other genetically engineered crops like canola and rice and a few others they cite. But those past incidents don't here provide harm from these limited steckling permits. Instead, they raise the issue of whether genetically engineered crops in general can harm the environment, et cetera. But APHIS hasn't approved that here. It's approved these four permits with a limited period of growth. They also cite the future harms that are tied to the entire cycle, the commercialization cycle. They describe it in a few different ways. But those future harms also aren't at issue here. They're waiting for the next case, which now is pending in the district court. And third, they cite the procedural harm from the alleged NEPA violation. And as the Supreme Court made clear in Summers and this Court in the more recent Willerness Society case, that procedural harm alone isn't enough. You need a concrete injury that has to be actual and imminent in order to have standing. Because there's no harm either from the past harm, future harm, or procedural harm, there's no basis for standing here or for the injunction. As to the merits, plaintiffs haven't established a likelihood of success there either. APHIS complied with NEPA and analyzed the potential environmental impacts of the permits and reasonably concluded that there will not be any based on the fact that it was not authorizing the later stages that trigger the risk of gene flow. Let's assume for the sake of argument that you're correct in terms of the biology of sugar beets. The claim here, part of the claim on behalf of the plaintiffs, is that regardless of whether there is actual contamination or not, they are forced to certify that or prove that their crops have not been contaminated, and therefore they suffer economic harm, even if there's really no possibility of contamination. How do you respond to that? Well, I think that harm also, though, is tied to a contamination risk. And that contamination risk is a fear of contamination risk by third parties, rational or irrational. I think is the point, is that in order to sell these products abroad, then they have to certify as organic, they have to certify that they're organic, and have to – that if there is a possibility of contamination, then the argument goes, then they have to prove that their product is not contaminated, which is costly. That's the way I understand that part of the argument. How do you respond? Well, that's right. The quick response is that arises from the next action, but not this one, because there's no possible risk, rational or irrational, from these four permits for these stacklings, because they're not going to flower, they're not going to release pollen, and the permits expire in 13 days. By the time the permits expire, these stacklings won't – can't release anything. No, I understand that, but I mean, that's why I said it's rational or irrational fear. I mean, the third parties are perfectly capable and can say, look, I don't care what the government says, you've got to show to me that these – that your crops aren't contaminated. Right, and that's the sort of – in the Supreme Court case in Monsanto, the court held that plaintiffs there did have standing, and essentially said there's a potential cost of the genetic pollination of their crops. And I don't think it parsed it whether it's a rational or irrational cost, but said, well, there is one. But the difference here is we're in the part of Monsanto versus Geertsen where the pollination and that potential contamination, then there is no harm to justify either an injunction or, in this case, standing. As to the merits, I'll make one more really quick point before turning it over to Mr. Bress if that's okay with the Court. This is not the quintessential case of the agency carving up its actions into smaller pieces to avoid review. This first action does not irretrievably commit APHIS to anything. Plaintiffs make the point repeatedly that APHIS is now on the hook for – to authorize everything, but that's just not the case. The permits said up front to the – and the permits say this to the applicants, we haven't made another decision. Granting these permits does not foreshadow what we're going to do next. So if you want to plant pursuant to these permits, that's your risk, you, the regulated party. The agency, however, had not bound itself to make any decision down that road, and it did not surrender its right to prevent future activity. And that's surrendering the right, that's exactly as pulled from Conner v. Buford and other cases from this Court that make clear that the commitment has to be irretrievable and irreversible in order to compel the agency to analyze the whole scope of action up front. So unless the Court has any further questions right now, I will reserve the rest of my time for rebuttal and for Mr. Bress. Thank you. Good morning, and may it please the Court. My name is Richard Bress. I represent Intervenor Appellants. I'd like to address a few of the questions that this Court has asked. I agree certainly with my brother on his answers, but I'd like to, you know, further address a couple of them. Number one, one of the things you would need before you have irreparable injury, Judge Schroeder, when you would ask when it could occur, is it can't occur with respect to fear of a future government action. I mean, the minimum is it has to be an action the government has already taken. And we know that because the Supreme Court had two reasons for saying there wasn't a need for an injunction to ward off a future injury in that case. The first one was we didn't know what the government would end up doing yet and thus whether it would pose any risk of harm. But the second one was even if we could guess what the government might do, you don't need an injunction now. You wait until the future case. That's what the Supreme Court held as its second reason. And it was very clear, here are two reasons. Judge Schroeder, you also asked has this case become a bit extraneous. And I would say yes. Even if you granted plaintiffs everything that they've argued, of what is the matter with the agency action here, and I don't grant any of that for all the reasons that I've given. But I would say that the Supreme Court, and I'm not going to go into all the reasons we've written in the brief, their worry is that granting the permits would foreshadow or cause a future action. Well, the future action has happened right now, and they're seeking to challenge it in the court below. It turns out they were right on that. What's that? It turns out they were right on that. No, not at all, Your Honor. The fact that A, that B follows A does not mean that A caused B. No, no. You said foreshadow, and you said causation. I'm sorry. I think it's certainly foreshadow, don't you? Well, I don't know that it – I'm not going to quibble with you on words, Your Honor. That certainly isn't my purpose. You hope the agency – I mean, from your client's perspective, you hope the agency – Well, and indeed, you know, from our perspective, the agency took the first action in order to give itself the option of allowing us to continue to grow the crops if it later took that action. But the point being, if that's their fear, destroying these crops is not going to do anything to advance their interests. As to the EA that just came out, it came out to litigate that on its merits one way or the other. What was the timing of that with respect to the district court's order here? The district court's order here was December 1st to destroy the crops, followed by December 3rd. And the EA? The EA just came out last Friday. I'm sorry, when? Last Friday. Friday. So it's absolutely not necessary towards that. That's over. It's not going to influence the agency one way or another in terms of how it comes out on the EA. The EA is out. And to the extent that they're worried about a future EIS, I'll tender to you that that will much more likely be affected by anything at all by the litigation about the EA than about these particular crops. There's no showing that you need to destroy these crops now. If they succeed in attacking the EA and if they can prove everything they would need to prove to get an injunction, they can seek to do that in that case. But for here I would say we've gone from unjustifiably harsh injunction to one that's completely pointless. In terms of proof of injury from the plants, whether they can be injured by an inchoate fear that's not backed by any science, I agree with my brother that you can't. But even if you could, there's no proof in this case that a single one of these plaintiffs has lost a single sale up till now to any market, even during the period that the crops were completely unregulated. Right. But there are two components to that. One is irreparable harm. The other is standing. Why isn't it enough to give standing if they make the allegation that they must they could suffer these increased costs? Well, I think even for standing you need proof of a threat of an imminent injury. And the fact that it has never occurred, even during periods of wide deregulation, the fact that there's no proof that any buyer has actually said to them, now I need you to test all of your crops and I need you to certify that they're all tested because we're worried about these four steckling fields. I mean, you would need something like that. They can't simply have a declaration that says we're worried we're not going to be able to sell our crops to foreign markets because they might cause us to certify. With due respect, that's not enough to put a threat of imminent injury. When would we know, when would injury be imminent? Here, you represent Monsanto. We live on a court where we're constantly seeing the manifestations of injuries that were not, perhaps could have been predicted, perhaps not. But, you know, the point of injunctions is to try to prevent injury from happening. So in a situation like this, is injury imminent when we find out that there's actually been cross-pollinization and injury of other plants or that people are injured or poisoned or what do we know? Well, let me just preface this, because I can't not do this with, there's no danger of poison here. No one is, you know, this is completely safe for human consumption. We eat it all the time, all of us, and sugar. But putting it to the next question, which is really your question, you know, I think they'd have the ability, for example, to try to prove in the next case about the EA that the limits that have been drawn in the EA, such as the four-mile isolation distance, such as the geographic limitations that are in there, such as the cleansing of the machines after they're used to process, et cetera, simply are not enough to stop cross-pollination. Now, again, I think you have to go further and say why that injures you, and you'd have to prove through affidavits or otherwise that that has caused you an injury. Now, the Supreme Court in Monsanto did find that the plaintiffs in that case had established enough to overcome a standing hurdle on that record as to whether a total deregulation would cause them to have to test their crops and that that sufficed. In terms of irreparable injury, I tendered to you that you'd have to do the same sort of analysis, although, you know, once again, and this is beyond this case, you'd have to prove that the type of injury you're going to suffer is truly irreparable and not simply that you're not getting as much money for your crops as you would like. I'll note here, and then I'd like to sit down to save time for rebuttal, that there's no threat of any injury to biodiversity present in this case. The Stecklings themselves don't threaten that at all. They're not even present in the States where most of the table beets and Swiss chard seeds are grown. Kagan. Stecklings don't. Stecklings don't. But the next step and the next step and the next step. Even as to the next step, Your Honor, I will note that the EA that has come out doesn't allow any growth of Roundup Ready sugar beet seeds or roots in California or western Washington State where the vast bulk of table beet seeds and Swiss chard seeds are grown. But I think I should save some time for my brother and I for rebuttal. Thank you so much. May it please the Court. Paul Ashitoff, appearing for the appellees. Well, it seems that the defendants have quickly tried to transform this case into one about the EA that came out a week ago and completely overlooked the fact that this case began in September without any EA, without any partial deregulation. The agency gave the green light to the industry interveners to go ahead and start planting a crop that the district court had already determined repeatedly posed a likely threat of harm, irreparable harm, to my clients without doing any environmental analysis and at the same time announced the fact that it was considering a petition to deregulate and would likely come out with a decision on that in a few months. Now, six months ago when the district court in August vacated the deregulation of this crop, it presciently observed that APHIS's position is that it's merely a matter of time before they reinstate the same deregulation decision, that conducting the requisite comprehensive review is a mere formality and that defendants are not taking this process seriously. Subsequent events have proved the district court was exactly right. The arguments that we've heard this morning would seem to sweep away completely all NEPA jurisprudence in favor of saying, well, we came out with an EA, so it's all over, thank you very much, next case. Not so fast. The regulations and the statute of NEPA are very carefully designed to an end that I would summarize as saying that the agencies have to take a hard look at the proposed actions, effects, and reasonable alternatives before the action occurs. The action that we're talking about here is the planting of the stecklings. Now, section 1508.25 specifically is designed to prevent agencies from doing what this agency did here. It says, to determine the scope of environmental impact statements, agencies shall consider actions that may be connected actions and therefore should be discussed in the same impact statement. Actions are connected if they are interdependent parts of a larger action and depend on the larger action for their justification. That's clearly what we had here. It would be ridiculous to contend that the planting of this crop, which was designed to produce seed, had any independent utility. And this Court has established that as a test for whether or not this regulation applies. The independent utility tests whether it would make sense to plant this crop without the expectation that this crop is going to produce seed. There is no other purpose for this crop. Now, the agency wants to simply wipe this away by inserting the fig leaf of boilerplate in the permit that says we reserve the right to not allow this to, these plants to produce seed. They might as well say, go ahead, build your power plant without your EIS, but we reserve the right not to let you power up. And at some point down the road, we'll do the EIS before we allow you to do that. That's simply not the way NEPA works. And with respect to calling the harm remote or speculative, simply because the agency has put in boilerplate like that, where it is actually given the green light to go ahead and break ground and plant hundreds of acres of a crop that has no other purpose but to produce seed, it's absurd. I mean, this Court has repeatedly found in a variety of contexts that a plaintiff does not have to wait until the wrecking ball is at their door before they can obtain relief. In the programmatic context, going back to Idaho Conservation League v. MUMMA, the Court said, notwithstanding that the management plan's concrete effect might be seriously mitigated at the site-specific level, it represents an important decision, and that these injuries must be deemed immediate and not speculative. In Citizens for Better Forestry, the relevant inquiry for the immediacy requirement in the procedural context is whether there's a reasonable probability that the challenged procedural violation will harm the plaintiff's interest, not how many steps must occur before such harms occur. Now, in Pitt River, this Court said that the agency was required to conduct a NEPA analysis before extending leases for geothermal plants, before the lease extensions, because the lease extensions did more than preserve the status quo. In Bob Marshall Alliance, the leasing opens the door to potentially harmful activity. All of these cases found that plaintiffs have standing to bring suit for a violation of NEPA well before there is any harm that is temporally imminent. The harm was the violation of NEPA that opened the door. Mr. Ashitoff, doesn't the CFRs support your position that APHIS has an obligation to look at the cumulative effects? Yes. It has an obligation to look at cumulative effects, foreseeable effects, direct effects, indirect effects. And foreseeable agency action, even if the agency never takes the action. That's correct. And here we know they did. Well, here the permits themselves said on their faces that, quote, it is reasonably foreseeable that at the end of the permit periods, the applicant may seek to transplant stecklings under a new permit. It was obviously what was on everyone's mind. It was what was intended. It said the purpose, this is from the permit, the purpose of the fall 2010 field release is to produce seed stecklings, seed vernalization for transplant into basic seed, commercial production trials in the winter of 2010 to 2011. Stecklings, quote, will be utilized for subsequent transplanting. So to suggest that the agency either couldn't foresee this happening, it's literally absurd. Of course they could. And they had a duty under NEPA to consider that in an environmental assessment or environmental impact statement before they gave the green light for these permits. Sotomayor, if we were to agree with you on that, then what impact would that have on the litigation that's going on now in the next stage? If the Court agrees with me, then it should uphold the district court's orders because the district court did not err. The Court, after an evidentiary hearing and reviewing voluminous evidence after almost three years of litigation, decided that the most appropriate approach to addressing the threat of harm that the defendants had created through their own precipitous and heedless actions was to remove that threat and clear the way for a NEPA process that might have some prospect of having integrity instead of being fatally undermined by allowing the action to go forward with a predetermined outcome. So does that translate to nothing happens until there's an EIS? Well, the defendants are permitted to argue in the district court that their EA is adequate and that their partial deregulation decision is adequate, and the plaintiffs are entitled to argue that it isn't. But that's up to the district court. The existence of the EA, the adequacy of the EA, are frankly not before this court at all. What's before this court is, did the district court err in issuing its injunction? And there is no reason to assume that it did not, particularly not simply because they have belatedly come out with these new agency actions. The adequacy of those agency actions is, of course, hotly contested. From the plaintiff's perspective, they are woefully inadequate to address the harm, and the injunction is every bit as necessary as it ever was, more so, in fact, because the date is fast approaching when the pollination will occur. And so, you know, I think it's clear that what this court should not do is become involved in the question of what is the effect of this environmental assessment, what is the effect of this partial deregulation. In the Warm Springs Dam Task Force case, the court said that the preferred procedure is to remand, to give the district court the opportunity to pass on the changed circumstances, unless, as in that case, the changed circumstances can give rise to only one result. And in that case, there was a study that the court concluded could not be successfully challenged, that it was undisputed and demands only one result, and therefore the court dealt with it up front. Here, that's obviously not the case. The adequacy of the partial deregulation decision and the measures and the mitigations and the EA procedurally and substantively are certainly contested, and the district court will have an opportunity to address it. So let's get to the case at hand then. On the injunction, and you need to show irreparable harm, and we know from Winters that's more important than ever, and also you have to show injury for standing, but if you don't mind, let's conflate that. What on this record demonstrates the harm to you that's imminent? And I understand your connected action argument, too. So I'm just interested in what's in the record that can show harm now, or imminent harm. Roberts, just to be clear, by imminent, as I would, I believe the term should properly be used to not describe harm that necessarily will occur tomorrow or the day after tomorrow, but that harm becomes imminent for NEPA purposes, standing purposes, injunctive relief purposes, when the procedural harm has occurred, in this case the failure to comply with NEPA, that gives rise, a reasonable probability of the concrete injury. The concrete injury that we are most concerned about in this case, and there are a number of them, but I'll give you an example, is we represent family farmers who grow organic seed, Swiss chard, table beets, and other vegetable crops in the Willamette Valley of Oregon in the same locations as where it is undisputed that these seed crops for the genetically engineered sugar beets will be grown, have been grown. That's where the stecklings will be transplanted very shortly to produce seed. They're currently 28 miles, as I understand it from the record, from your closest client, the stecklings? Where the stecklings actually are, I don't know where the stecklings actually are, but the point is stecklings are in due course designed to be transplanted into fields. They are not expected to mature in the place where they're originally planted. So if we were to reverse the injunction, what happens to the stecklings? If you were to reverse the injunction, the stecklings, well, defendants would know better than I, but I would assume, based on my knowledge of the record, that the stecklings have already been pulled out of the ground, as is typically the case, and then they are put into storage to be transplanted around this time. And then they are transplanted into fields that are used to produce seed. And, of course, to produce seed, the plants must flower. When they flower, they produce vast quantities of pollen. Now, there is evidence in the record that that pollen not only can, but has been shown to have traveled far greater distances than the four-mile distance that has been used in this case. The agency seems to believe that this is a safe isolation distance. But if I would call your attention to But this is not the next phase that we're worried about. I understand your argument. But under the permits, the stecklings are not permitted to get to the pollination point. Well, and If we're just dealing with the permit. Well, if we're just dealing with the permit, the Court did find that the just dealing with the permit, that the stecklings themselves may escape, as they did, in fact, despite the attempts of the industry a couple of years ago, the stecklings did actually wind up in potting soil mix being sold to the public, unbeknownst to anybody, until somebody happened to come by and was familiar with the fact that genetically engineered sugar beets were being grown in that area and had it tested and found that, yes, in sugar beet stecklings. And then one of the interveners rushed out to try and gather them all back and destroy them and so forth. And clearly, nobody expected that to happen. Nobody wanted it to happen. But it happened nonetheless. We put on evidence at the evidentiary hearing. And the defendants from APHIS acknowledged that on many occasions, the genetically engineered crops that have been subjected to what they consider to be very strict conditions to control any possibility of escape have, in fact, escaped and have, in fact, caused enormous economic harm. An example would be an herbicide-resistant strain of genetically engineered rice that has caused roughly a billion dollars' worth of damage. And APHIS to this day says, we don't know how it happened, but it was never even put on the market. It was never commercialized. And therefore, the best guess is that it escaped from a supposedly carefully controlled field trial. But I don't want to focus completely on the field trial issue, on the steckling permitted issue, because we're dealing here clearly with connected actions. And I think to focus only on what is the harm from the stecklings alone really avoids what I believe to be the question presented by this case, which is that the agency was required to assess not only that, but what everybody knew was coming after that, which is seed production. Otherwise, you're simply dispensing with the entire jurisprudence of connected actions. And I don't think that would be appropriate. What prevents you from seeking an injunction with respect to the environmental assessment? We have already filed for one. That's what I thought. Yes. Which is the same relief you're seeking here, essentially? It is... Let me put it this way. The relief here would be subsumed if you were able to obtain an injunction in that case, right? Depending on what kind of relief we obtained, it very well might, yes. But at the moment, of course, that's all up in the air. The problem that we have here is that the stecklings, which were unlawfully planted in the first place, have vitiated the NEPA process. They have fatally undermined it. I believe counsel for defendants said, well, there's no worry now that APHIS would be influenced by the fact that these plantings went on already. I respectfully disagree. There are many cases, Metcalfe v. Daly, Pitt River, for example, say clearly that when the agency jumps the gun this way, then you have a real problem with not only possibly the substantive adequacy of the EA, but the procedural adequacy of the EA. And so really the only way in these types of cases to address that is to wipe the slate clean. That's why it's important in this case to actually destroy the stecklings, both to protect my clients and to protect the integrity of the NEPA process. Otherwise, you're simply rewarding the defendants for unlawful conduct and, again, putting my clients at risk for their conduct. So I think that the district court's order should be sustained. Now, they have the opportunity to go back to the district court and argue, based upon these new administrative actions, that for whatever reason, that injunction is no longer appropriate, no longer necessary, no longer equitable. They can ask the judge to reconsider that. But that's not a reason for holding that he erred in the first place by issuing it. Ginsburg. Your time has expired. Thank you very much. So just two points I'd like to focus on. First, harm from the permits. Mr. Atchitoff described harm from the future actions and harm from what may occur if pollen is released and harm from the farmers if that pollen contaminates their crops. But these stecklings aren't going to release pollen. They have not. They're not going to by February 28th, and these permits are going to expire then, and there's that risk just doesn't exist in the case. The lack of that risk means there's no reparable injury for an injunction, and there's no actual name-in-hand harm for standing. And there's nothing in the record here. The declaration's in the record. There's no declaration, hypothetical declaration that's not in the record from a farmer next to these permitted fields saying I'm going to be harmed by these permits. There's nothing linked to these fields. There's nothing addressing the four permits at issue here that establishes harm. About connected action, Mr. Atchitoff cited to Metcalf and to Pitt River, and those cases are very different than the situation here. Metcalf addresses the situation of when has an agency taken an action that binds it to take a later action. In Metcalf, the agency two times entered into an agreement saying we are going to work with you tribe to facilitate whaling. So there was an agreement. There's nothing like that agreement here. In fact, the permits say, and I know Mr. Atchitoff says it doesn't count, but they say that there's no further promise with what it's going to do with the next action. But the application for the permits, your clients indicated they were for transplanting into basic commercial seed production trials, right? Right. There's no doubt that one of the purposes here of these permits is to preserve the option for APHIS to authorize a later action, and that these, many of these stecklings put them on the table. Unless the Court has any more questions for me. Can I just ask, does Monsanto, does the Supreme Court's, are you going to get up to? Oh, I wasn't clear on that. Okay. Never mind. Okay. Thank you. I just would like to drill in a bit further the notion that the connected action cases do not operate in the way that plaintiffs suggest. They require an irretrievable commitment of resources, whether that was the agreement that was at issue in Metcalf, whether it was the agency's investment of considerable of its own resources in Thomas, whether it was in Pitt River or the non-NSO leases that were at issue in Conner, where they had actually leased the property to private entities without holding back the ability to control the property. Irretrievable commitment. This case is far more like Western Radio, far more like Wild West, far more like the NSO leases that were at issue in Conner. I would implore this Court to take a, you know, to read Conner carefully, because I think Judge Norris very nicely explained the difference between where you've got an irretrievable commitment and where you merely have preliminary action that doesn't irretrievably commit resources. Does the Supreme Court's decision in Monsanto say anything that helps you? Oh, my gosh, yes, Your Honor. The Supreme Court's decision in Monsanto. I just wanted you to say it. Yes, Your Honor. The Supreme Court's decision in Monsanto, A, establishes our case for preliminary for un-injunctive relief for the reasons we've discussed. On standing, the very same things that the Supreme Court said in Monsanto about not being able to know yet what harm you're going to do. That satisfies that. And even as to the merits, the Supreme Court said the agency can go back, do something preliminary before it does an EIS. The district court said we couldn't. The Supreme Court's right. Thank you, Your Honor. Thank you, counsel. The Court appreciates the arguments of counsel on both sides. The case just argued is submitted for decision. That concludes the Court's argument for this morning, and the Court stands adjourned. All rise. This Court is adjourned.
judges: Bennett, Schroeder, Thomas